## Staunton.

### JOHNSON V. JOHNSON.

September 17, 1919.

Absent, Kelly, J.

DIVORCE—*Sufficiency of Evidence to Sustain Charges of Adultery and Desertion.*—A husband instituted his suit for divorce, alleging that his wife had willfully abandoned him, and that she had been guilty of adultery. The answer of the wife denied all the allegations of the bill and charged the husband with having willfully abandoned her, and with cruelty, and prayed that her answer might be treated as a cross-bill and for a divorce from bed and board.

   *Held:* That the evidence introduced was insufficient to prove the charge of adultery against the wife, but that upon the question as to which of the two had willfully abandoned or deserted the other, the trial court, upon the evidence, could not have found otherwise than for the husband; and, that its decree in his favor for a divorce from bed and board should be affirmed.

Appeal from a decree of the Circuit Court of Russell County. Decree for complainant. Defendant appeals.

*Affirmed.*

The opinion states the case.

*W. W. Bird, A. G. Lively, G. B. Johnson* and *C. C. Burns,* for the appellant.

*Finney & Wilson,* for the appellee.

PRENTIS, J., delivered the opinion of the court.

Aaron S. Johnson instituted his suit for divorce, alleging

that his wife had willfully abandoned him, and that she had been guilty of adultery. Her answer denies all of the allegations of the bill, charges him with having willfully abandoned her, and with cruelty, and prays that her answer may be treated as a cross-bill and for a divorce from bed and board.

The decree of the trial court acquits the wife of the charge of adultery, but is in favor of the husband for a divorce from bed and board upon the ground of desertion. From this decree she appealed, and both parties assign error.

There is much testimony, disclosing conflict and disagreement which could have been avoided if each had been generous to the faults of the other, and which has resulted disastrously for both. The wife in her answer and evidence charges her husband with lack of appreciation, coldness, oppression, penuriousness, cruelty for many years, and recently with accusing her of having committed adultery culminating in his desertion. She produces no witness, however, in support of these more serious charges, and her case depends upon her own testimony. The only witnesses she introduces are two, by whom she undertakes to discredit the testimony of Noah Maxfield by showing that because of the construction of the house he could not have seen her or P. H. Smith, the man with whom she was charged with having committed adultery, as they came down a stairway from the upper floor of the store building. The evidence is insufficient for the purpose for which it was introduced, because its whole basis is that the witness, Maxfield, stood immovably fixed in a particular place in the store, whereas his evidence cannot fairly be so construed. Then she introduced one Fielding Combs, who testified in substance that after the suit was instituted the husband told him that he could not prove anything against his wife—evi-

dently alluding to the charge of adultery; and then Peter R. Smith, who sold her his interest in the business, for the purpose of showing that the husband did not participate in the negotiations, whereas he testified that he did so participate; and Bertha Nash, who testified to grossly offensive remarks made by the husband to his wife in the presence of his children after the suit was instituted, and that after the separation he said that he did not intend to return to her. This, with the exception of the testimony of P. H. Smith and her own, constitutes the entire evidence upon which she relies. On the other hand, the husband introduces twenty-four of his friends and neighbors, who were also her neighbors, for she had been born and reared in the same community and had lived her entire married life there. These witnesses testify as to various phases of the controversy, and their testimony all tends to sustain the husband's allegations. The wife has a father, mother, sister and brother, and although it appears from the husband's testimony that he had discussed their troubles with her relatives; that her mother and brother had talked to her on the subject; that her father sent a friend to her to talk to her, and from her testimony that her father has himself cautioned her to be careful in her conduct, none of these relatives are introduced to support her upon any point.

These incidents preceded the controversy: The wife purchased a one-half interest in a stock of goods in a country store, within about one-half a mile of her home. The other half was retained by the vendor, who was the father of P. H. Smith. Young Smith was to stay in the store, in his father's interest, and as a salesman. He was also to board with her, and she was to have general supervision of, and to give such time to the business as seemed to her necessary. The vendor, however, required security, and

hence her husband endorsed her notes for the unpaid purchase money. Shortly after that her husband voluntarily gave her $300 to put in the business, which prospered, and she gave more and more time to it. Certain occurrences aroused the husband's jealousy of Smith. The first one was when he unexpectedly returned to the store and he thought that she appeared to be unaccountably excited and confused. That night he called her attention to the circumstances and asked for an explanation. She gave a perfectly natural explanation of the situation, and requested him to go to the store to examine Smith and to make certain other investigations for confirmation of her statement. This he declined to do, but apparently in perfect good faith accepted her statement as true. From time to time, as he thought, and as others also thought, she indicated a greater pleasure in Smith's society than in his own, and he proposed to buy the other half interest in the store for himself. This proposition she refused to entertain, the reason alleged being that she knew that he was anxious to get possession of her interest and to control the business. Afterwards, however, with her husband's assistance, he endorsing her notes and giving the security which the vendor required, she bought this other half interest and became the sole owner of the store. It is apparent that in this the husband was trying to break up her growing intimacy with Smith which so disturbed him. His disquietude and disapproval were justified, because, while the evidence fails to sustain this charge of adultery, it is perfectly manifest that many in the neighborhood suspected that there were improper relations between Smith and his wife. They were frequently alone at the store, sometimes after dark. As time went on she spent more and more time there with him and less at the home which her husband had provided for her. So widespread was this suspicion and so common the talk, that two little

boys testified that because of what they had heard they cautiously entered the store on one occasion for the purpose of spying on them.  Her father sent a friend of the family to talk to him on the subject, and this friend testifies that when he attempted to do so, the husband exhibited great distress and refused to discuss the matter.  Notwithstanding this situation so likely to arouse suspicion and to excite gossip, and in spite of her husband's jealousy of which she knew, she kept Smith in the store three months after she became sole owner.  After he left there she conducted a correspondence with him—not an improper correspondence, as is apparent from the letters introduced, which relate only to the unfinished business of the old firm.  During this correspondence, however, no one but she and Smith knew the subject thereof.  He came to see her two or three times thereafter; and he also from time to time ordered personal articles of clothing from her.

Smith's reputation in the community had suffered because a young unmarried woman had accused him of being the father of her child, and there is evidence tending to show that Mrs. Johnson's attitude towards him was due to her benevolent wish to practice what she professed and to prove to those whom she thought too censorious that "while a man may be down, he is never out."  She testified that until after Smith left the immediate neighborhood she had never heard of this gossip which reflected upon her, but if she had not, her husband and her neighbors had, and she had been told a year before that time by her husband of dissatisfaction.  She certainly knew of this neighborhood gossip after Smith left, and yet she continued her intercourse with him in such a way as to excite further comment.

Her husband testifies that she became colder to him as her apparent fondness for Smith increased, and that she finally denied him access to her bed and his marital rights

in the spring of 1915. The evidence shows that in the following July, two nights before Smith left their home the husband commenced sleeping at his mother's, which is within half a mile of their residence and within 100 yards of the store, though he continued to take some of his meals at his home, to cultivate his farm, and to see his children. On the two nights before Smith left, he stayed at his home until all had retired. He continued to sleep at his mother's until some time in December, when he returned to his home to sleep. He was then again denied access to his wife's bed, and sent to a separate room upstairs, and she was at that time preparing to move, with their three children, to the store. They quarreled and differed over this, but she went against his will, claiming that she could not attend to the store business during the winter months and at the same time properly look after her little children unless she did make this move. It is substantially proved by three or four witnesses who helped her to move that one of her motives, as expressed by her, was to rid herself of her husband. He followed her to the store, evidently persisting in his desire for a reconciliation. Her account of this is that she agreed to such reconciliation only upon condition that he would stop charging her with adultery with Smith, and that as he continued to make that charge she refused to become reconciled. At any rate, she still refused to renew her marital relations with him, required him to stay in a separate room, and after three months he moved to his mother's house about one hundred yards away.

Whatever the husband's shortcomings, it is abundantly shown that he always desired and repeatedly sought reconciliation. He gave her money and he endorsed her notes, whereby she was enabled to acquire and to prosecute her business during the very period in which she is charging him with the grossest sort of cruelty, penuriousness and indifference to her rights and feelings. She complains of

his failure to supply herself and his children with cloth-ing, and yet upon the few occasions when he sought to do so, his efforts are ridiculed by her. That she suffered for nothing in this respect is perfectly apparent from the fact that he had accounts with the local merchants from whom she could obtain goods on his credit, and that she had saved some money before her marriage which she still has; that she always had her separate purse; and that in her domes-tic economics, especially in the raising of chickens, she had $300 of her own in bank at the time she bought an interest in the store; and he says that she told him that she pre-ferred to buy her clothes and the children's. That he sup-plied her and their children with a home furnished prop-erly, judged by the neighborhood standard, and with food, and that until Smith appeared upon the scene, so far as their intimate friends could perceive, they lived as happily as married people usually do, is apparent from the evidence. It is also manifest that upon the question as to which of the two has willfully abandoned or deserted the other, their friends and neighbors, as indicated by their evidence, and her own relations, as shown by their silence, have adjudged her to be most at fault. The trial judge could not have found otherwise from the testimony.

Upon the charge of adultery, the husband has failed. While if her heart had rested upon him, she could not have been as indifferent to his happiness as is shown in this record, the evidence is insufficient to prove this charge, and the trial court rightly acquitted her thereof.

The case has peculiar features, in that, notwithstanding all the evidence of desertion, the parties now live within a stone's throw of each other. Their duty to their children and to society requires that they should ignore the antipa-thies engendered by this litigation and become reconciled.

*Affirmed.*